

Priority ✓
Send ✓
Enter ✓
Closed
WM/JS-6 ✓
JS-2/JS-3
Scan Only

ENTERED
CLERK, U.S. DISTRICT COURT

JUL 20 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

JUL 19 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

1
2
3
4
5
6
7

8    UNITED STATES DISTRICT COURT

9    CENTRAL DISTRICT OF CALIFORNIA

10    WESTERN DIVISION

11

12  BISTRO EXECUTIVE, INC., dba,            )  No.  CV 04-4640 CBM (MCx)
    TOURNESOL BISTRO PROVENCAL,             )
    a California corporation, et al.,        )  ORDER RE: PARTIES' CROSS
13                                           )  MOTIONS FOR SUMMARY
                                             )  JUDGMENT
            Plaintiffs,                      )
14                                           )
                                             )
15          v.                               )
                                             )
16  REWARDS NETWORK, INC., a                 )
    Delaware corporation, et al.,            )
17                                           )
            Defendants.                      )
18                                           )

19        The matters before the Court, the Honorable Consuelo B. Marshall, United

20  States District Judge, presiding, are the parties' cross motions for summary

21  judgment.

22                          **JURISDICTION**

23        This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332.

24              **FACTUAL AND PROCEDURAL BACKGROUND**

25        Plaintiffs filed this class action in California state court on May 25, 2004,

26  alleging that Defendants have run a "loansharking scheme" against hundreds of

27  California restaurants. Plaintiffs allege that under this scheme, Defendants

28  purported to "pre-purchase" food and beverage "credit" at the restaurants by

233

advancing cash to the restaurants. Defendants "purchased" credits valued at twice
the amount of cash that they advanced to Plaintiffs (e.g., a cash advance of
$20,000 entitles Defendants to $40,000 of food and beverage credits). In
exchange, Plaintiffs allege they had to "repay" up to 200% of the value of the
original cash advance, with such repayment subject to Defendants' security
interest in all of the restaurants' present and future personal and real property.
The cash advance is "repaid" over time as Defendants' members eat at the
restaurants and the restaurants in turn hold 80% of the members' payments in
trust for Defendants. Plaintiffs allege that Defendants' scheme is a disguised loan
that violates California Usury Laws (Cal. Const. Art. XV §1) and California's
Unfair Business Practices Act (Cal. Bus. & Prof. Code §17200 et seq.).

This case was removed to this Court on June 25, 2004, and the Court
granted Plaintiffs' motion to certify a class on October 11, 2005. The parties filed
cross motions for summary judgment and oppositions and replies were timely
filed.

## STANDARD OF LAW

Summary judgment against a party is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact and
that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c). A party seeking summary judgment bears the initial burden of informing
the court of the basis for its motion and of identifying those portions of the
pleadings and discovery responses which demonstrate the absence of a genuine
issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where
the nonmoving party will have the burden of proof at trial, the movant can prevail
merely by pointing out that there is an absence of evidence to support the
nonmoving party's case. *See id.* If the moving party meets its initial burden, the

1   nonmoving party must then set forth, by affidavit or as otherwise provided in

2   Rule 56, "specific facts showing that there is a genuine issue for trial." Fed. R.

3   Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

4        In judging evidence at the summary judgment stage, the Court does not

5   make credibility determinations or weigh conflicting evidence and draws all

6   inferences in the light most favorable to the nonmoving party. *T.W. Elec. Svc.,*

7   *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). The

8   evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e).

9   Conclusory, speculative testimony in affidavits and moving papers is insufficient

10  to raise genuine issues of fact and defeat summary judgment. *See Thornhill Pub.*

11  *Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

12                              **DISCUSSION**

13  **I.    Plaintiffs' Usury Claim**

14       The parties cross-move for summary judgment as to Plaintiffs' claim that

15  Defendants' transactions violated California's prohibition against usurious loans.[1]

16  California courts have adopted the following elements of usury: (1) the

17  transaction must be a loan or forbearance; (2) the interest to be paid must exceed

18  the statutory maximum; (3) the loan and interest must be absolutely repayable by

19  the borrower; and (4) the lender must have a willful intent to enter into a usurious

20  transaction. *Ghirardo v. Antonioli*, 8 Cal. 4th 791, 798 (1994). It is proper for a

21  court to decide a usury claim as a matter of law where the facts are not in dispute

22  and the parties contest only their legal characterization. *See, e.g., Domarad v.*

23  *Fisher & Burke, Inc.*, 270 Cal. App. 2d 543, 560 (1969).

24  ///

25  ─────────────

26  [1] The usury claim underlies Plaintiffs' entire action. Plaintiffs' second cause of action for violation
    of California's Unfair Competition Law primarily arises out of the allegation that Defendants violate
27  California's usury law. Similarly, Plaintiffs' third cause of action for declaratory relief also arises
28  out of Plaintiffs' usury claim.

## A.    Whether the Transactions at Issue Were Loans

California's usury law applies only to a ". . . loan or forbearance of any money, goods or things in action." *De Guere v. Universal City Studios*, 56 Cal. App. 4th 482, 509 (1997) (citing Cal. Const., Art. XV, § 1). However, the labels that parties place on transactions are not dispositive of their true character. "Sensitive to the ingenuity and creativity of those entrepreneurs willing to engage in legal brinkmanship to maximize profits, courts have carefully scrutinized the form of seemingly innocuous commercial transactions to determine whether the substance amounts to a usurious arrangement." *DCM Partners v. Smith*, 228 Cal. App. 3d 729, 733 (1991); *Boerner v. Colwell Co.*, 21 Cal. 3d 37, 44 (1978).

To make this determination, courts look to "whether or not the bargain of the parties, assessed in light of all the circumstances and with a view to substance rather than form, has as its true object the hire of money at an excessive rate of interest." *Southwest Concrete Products v. Gosh Construction Corp.*, 51 Cal. 3d 701, 705 (1990). Only where the historical facts of a transaction are undisputed and have been clearly established is the issue one of law for the court to decide. *Ghirardo*, 8 Cal. 4th at 800.

### 1.    Application of Judicial Estoppel

Plaintiffs argue that the equitable doctrine of judicial estoppel should operate to prevent Defendants from taking the factual or legal position that the transactions in this case are purchases when Defendants had previously succeeding in taking the position that identical transactions constituted loans.[2] Judicial estoppel precludes a party from asserting one position in a judicial proceeding and then later seeking an advantage by taking a clearly inconsistent position in a later proceeding. *See Hamilton v. State Farm Fire & Cas. Co.*, 270

---

[2] Federal law governs the application of judicial estoppel in federal diversity actions. *Risetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 697, 603-04 (9th Cir. 1996).

-4-

1  F.3d 778, 782 (9th Cir. 2001). The U.S. Supreme Court, while noting that the

2  circumstances under which judicial estoppel may be appropriately invoked are

3  "not reducible to any general formulation of principle," identified several factors

4  which "typically inform the decision whether to apply the doctrine in a particular

5  case." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

> First, a party's later position must be "clearly inconsistent" with its earlier
> position. Second, courts regularly inquire whether the party has succeeded
> in persuading a court to accept that party's earlier position, so that judicial
> acceptance of an inconsistent position in a later proceeding would create
> "the perception that either the first or second court had been misled."
> Absent success in a prior proceeding, a party's later inconsistent position
> introduces no "risk of inconsistent judicial determinations," and thus poses
> little threat to judicial integrity. A third consideration is whether the party
> seeking to assert an inconsistent position would derive an unfair advantage
> or impose an unfair detriment on the opposing party if not estopped.

12  *Id.* at 750-51 (citations omitted).[3] Plaintiffs present undisputed evidence that

13  Defendants have previously taken the position in various judicial proceedings that

14  the transactions in which Defendants engage are loans, not purchases.

15  Specifically, Plaintiffs point to the position taken by Defendants before the New

16  Hampshire Supreme Court in *Transmedia Restaurant Co., Inc., v. Devereaux*, 149

17  N.H. 454 (2003), as well as in a number of cases filed in California Superior

18  Court. Decl. of Anthony Alden in Supp. of Pls.' Mot. for Summ. J. ("Alden

19  Decl."), Ex. C.[4] Plaintiffs argue that, in light of the position taken by Defendants

20  in these prior proceedings, judicial estoppel should prevent Defendants from

21  taking an inconsistent position in this action. Accordingly, the Court turns to a

22  review of the positions Defendants' allegedly took in prior judicial proceedings.

---

[3] Contrary to Defendants' effort to treat these considerations as mandatory prongs that must be
established, the Supreme Court made clear that "[i]n enumerating these factors, we do not establish
inflexible prerequisites or an exhaustive formula for determining the applicability of judicial
estoppel. Additional considerations may inform the doctrine's application in specific factual
contexts." 532 U.S. at 750-51.

[4] There is no dispute that Defendant Rewards Network has operated under the name Transmedia
Network, Transmedia Restaurant Co., Inc., and iDine Restaurant Group, Inc.

### a.    The New Hampshire Litigation

The New Hampshire litigation, *Transmedia Restaurant Co., Inc., v. Devereaux*, concerned a restauranteur's claims that Transmedia's liquidation of her restaurant equipment was commercially unreasonable, that the agreement between Transmedia and her husband had been fraudulently transferred to her, and that Transmedia's conduct constituted unfair and deceptive conduct. Alden Decl., Ex. A at 9. In its brief to the New Hampshire Supreme Court <u>Defendants' counsel</u> described Defendants as

> a company that loans working capital to restaurants . . . These restaurants repay their loans to [Defendants] by transferring 100 percent of the food and beverage tabs, less tax and tips, generated by [Defendants'] cardholders back to [Defendants]. These repayments are credited against the loan until twice the loan amount has been repaid. The loans . . . are typically secured . . . .

*Id.* at 10-11. This passage is but one example of many factual assertions that permeate the brief. Defendants' counsel consistently and repeatedly asserted that Defendants engage in loaning money to restaurants. Additionally, the thorough discussion of the transactions reveals that they are identical to those at issue in this case. In the New Hampshire case, as here, restaurants were obligated to pay double the amount of cash loaned. *Id.* at 12. Repayment of the loan was secured via the direct transfer of customers' receipts to Defendants. *Id.* The loans were secured by a contract, a security agreement pledging the restaurant assets, and a personal guaranty from the restaurant owner. *Id.* Indeed, Defendants' brief to the New Hampshire Supreme Court describes exactly the same provisions which Defendants' counsel in this litigation describe—the exception being the characterization of the transactions as loans.[5]

///

---

[5] Defendants do not, in their opposition to Plaintiffs' motion, dispute that the contracts at issue in the New Hampshire litigation are essentially identical to those in this case.

- 6 -

The New Hampshire Supreme Court adopted Defendants' representations about the character of Defendants' business and the transactions in which they engage. *See* Alden Decl, Ex. B. Indeed, in describing the relationship between the parties, the court noted that Defendants had made two $ 4,000 "loans" to the restaurants. *Id.* at 48. Additionally, the court adopted almost verbatim from Defendants' appellate brief its description of Defendants and their transactions:

> Transmedia is a company that loans money to restaurants . . . . Restaurants repay their loans from Transmedia by transferring 100 percent of the food and beverage tabs, less tax and tips, generated by Transmedia's cardholders back to Transmedia. Transmedia credits these repayments against the loan until twice the value of the loan has been repaid.

*Id.* at 48-49. As with Defendants' appellate brief, this cited passage represents but one example of the court's acceptance of the position asserted by Defendants. As the opinion makes clear, the court treated the transactions as loans and Defendants as a company in the business of loaning money to restaurants.

### b.    Various California Collection Actions

Plaintiffs also point to Defendants' filing of numerous complaints in California state courts seeking to collect from restaurants who allegedly breached their agreements. *See* Alden Decl., Ex. C. In each of these pleadings, Defendants' counsel stated that Defendants were suing restaurants based on "unpaid Security Agreement and Personal Guaranty for money *loaned to the [restaurants] by [Defendants]*. [Defendants] submit as *evidence of [the restaurant's] indebtedness* to it . . . true and correct copies of the Security Agreement and Personal Guaranty executed by [the restaurants]." *Id.* at 55-61 (emphasis added). In all of the cases, except one, Defendants obtained default judgments against the restaurants. Defendants' assertions in those cases may form the basis for the application of judicial estoppel. *See* Rand G. Boyers, *Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel*, 80 Nw. U. L. Rev. 1244, 1244-45, 1265 (1986) (noting positions taken in pleadings may trigger judicial estoppel).

### c.    Judicial Estoppel Bars Defendants' Inconsistent Position

In both the New Hampshire litigation and the California collection actions, Defendants consistently asserted the position that they were engaged in making loans to restaurants.[6] Further, they described the transactions in those cases, which are identical to those at issue here, as loans. In both the New Hampshire and California judicial proceedings, Defendants successfully persuaded courts to adopt Defendants' position, explicitly in the New Hampshire case and at least implicitly in California cases via the grant of judgments in Defendants' favor. However, now that the characterization of the transactions as loans works to their detriment, Defendants seek to argue that the transactions are not loans, but rather "purchases."

Defendants argue that, under *New Hampshire v. Maine*, their previous position that the transactions constituted loans do not warrant application of judicial estoppel. Defendants' arguments are not persuasive. Defendants first argue that the prior positions are not clearly inconsistent with their current position that the transactions are purchases. The cases Defendants cite are inapposite. For example, Defendants cite the Ninth Circuit's refusal to apply judicial estoppel in *Johnson v. Oregon*. 141 F.3d 1361 (9th Cir. 1998). *Johnson* considered the application of estoppel where an employee claimed to be disabled for purposes of seeking Social Security disability benefits but claimed be able to work with reasonable accommodations pursuant to the Americans with Disabilities Act. 141 F.3d at 1370-71. However, as the court explained, estoppel was inappropriate because the definition of "disabled" for purposes of obtaining

///

---

[6] The fact that the inconsistent positions may have been taken by a party's counsel will support the application of judicial estoppel to the party's subsequent efforts to assert inconsistent positions. *Hall v. GTE Plastic Pac. PTE, Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003)

1  disability benefits was different than for the question of whether an individual has

2  the ability to perform his or her job with reasonable accommodations. *Id.*[7]

3      Defendants' brief in the New Hampshire case and the state supreme court's

4  subsequent opinion make clear that the transactions at issue in that litigation are

5  indistinguishable from those before this Court, as discussed in greater depth

6  above. Additionally, the pleadings in the California cases demonstrate that the

7  transactions at issue in those cases are also identical to those in this case. Alden

8  Decl., Ex. C. There is no dispute that the agreements at issue in the previous

9  proceedings and in this case use similar, if not identical, language. Accordingly,

10  the position that the transactions in the previous proceedings were "loans"

11  explicitly and directly contradicts the present attempt to assert that the

12  transactions in this case were "purchases."

13      Defendants also dispute that they "took this 'position [that the transactions

14  were loans]' in the New Hampshire case." Def.'s Opp. at 6:9-11. The crux of

15  Defendants' argument appears to be that Defendants' counsel, at trial, described

16  the transaction as a "purchase." The fact that Defendants' counsel took

17  inconsistent positions within the same litigation does not prevent this Court from

18  precluding Defendants from asserting a position here inconsistent with the one it

19  persuaded the previous court to adopt. Indeed, the apparent willingness of

20  Defendants' counsel to take inconsistent positions within the same proceeding as

21  well as in different proceedings is one of the very harms judicial estoppel is

22  meant to prevent, namely parties playing "fast and loose" with the facts whenever

23  it suits them.[8] *See, e.g., Yanez v. United States*, 989 F.2d 323, 326 (9th Cir. 1993).

24

---

25  [7] Defendants also cite to other out-of-circuit cases which are inapplicable both under the facts of this case and the law of this circuit.

26

27  [8] Defendants' counsel in this case was not involved in the previous proceedings and the Court does not mean to suggest that Defendants' current counsel has taken inconsistent positions in this litigation.

28

1    Similarly, Defendants' argument that judicial estoppel should not apply

2    because the issues in dispute in the previous case did not concern whether the

3    transactions were loans or purchases is irrelevant. Defendants note that when

4    usury has been the issue, they have "taken the consistent position that the

5    transactions are sales not loans." Defs.' Opp. at 8 n.7. Certainly this Court would

6    not expect Defendants to concede that their transactions were loans when being

7    sued for usury. But, the strategic choice to describe the transactions as

8    "purchases" for purposes of defending usury suits and "loans" when it otherwise

9    suits them is precisely one of the evils that judicial estoppel is supposed to

10    prevent—parties taking a position in one case, and a second, inconsistent,

11    position in another, motivated not by the truth, but by a strategic calculus.[9]

12    Indeed, *New Hampshire v. Maine* does not require that the prior position

13    taken in an earlier judicial proceeding be central to the issues before the previous

14    court. 532 U.S. at 749-50.[10] The only mandatory consideration is whether the

15    prior position was clearly inconsistent with the one the litigant now seeks to

16    assert. *Id.* at 750. Another consideration that some courts consider is whether the

17    litigant succeeded in persuading a court to adopt the prior position.[11] The

18

---

19    [9] Defendants do not contend that inconsistent positions have been taken in different proceedings as
20    a result of mistake, inadvertence, or fraud, nor has any evidence been presented that would support
      such an argument.

21    [10] The Supreme Court identified several purposes that would be served by the doctrine's application
22    even if the prior position was not critical to the issues in the proceeding. 532 U.S. at 749-50 (e.g.,
      protecting integrity of the judicial process, prohibiting parties from changing positions according to
23    exigencies of the moment, and preventing parties from playing "fast and loose" with the courts).

24    [11] It is unclear whether such "success" is necessary in this circuit. The majority of circuits hold that
25    the doctrine's application is most appropriate when a litigant succeeded at persuading a court to
      adopt its prior position. *See* Moore's Federal Practice § 134.33[4]. The minority position applies
26    judicial estoppel even if the litigant was unsuccessful, out of concern for litigants playing "fast and
      loose" with the court. *Id.*; *Yanez*, 989 F.2d at 326. While the Ninth Circuit has not explicitly taken
27    a position on the issue, there is some evidence that it favors the minority view. *See* Michael D.
28    Moberly, *Playing "Fast and Loose" or Just Fast?: A Look at Judicial Estoppel in the Ninth Circuit*,

1    consideration is satisfied simply when a court adopts the position, even if the

2    litigant does not ultimately prevail as to the final merits of the overall case.[12] The

3    only relevant issue, then, is whether the previous courts accepted Defendants'

4    prior position, which the New Hampshire and California courts undisputedly did.

5        Defendants' prior position that their transactions with restaurants were

6    "loans" is clearly inconsistent with the position it now seeks to assert with regard

7    to identical transactions. Defendants were successful in persuading other courts to

8    adopt their prior position, and in the instance of the California cases Defendants

9    derived a substantial benefit when courts adopted the position Defendants

10   asserted. Defendants would derive an unfair advantage if allowed to take their

11   current inconsistent position that the transactions were purchases. Additionally,

12   allowing Defendants to take inconsistent positions depending on the exigencies

13   of the case would undercut the integrity of the judicial process. *Wagner v. Prof'l*

14   *Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1044 (9th Cir. 2004). This Court finds that,

15   under the facts presented here, the application of judicial estoppel is warranted.[13]

16   Accordingly, Defendants are estopped from taking the factual or legal position

17

18   33 Gonz. L. Rev. 171, 192-94 (1997/1998); *Baker v. Asarco, Inc.*, 5 A.D. Cas. (BNA) 187, 190 n.2
     (D. Ariz. 1995)(reading *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990) as endorsing the
19   minority view).

20   [12] *See* Boyers, supra, at 1256 ("'[A] party need not finally prevail on the merits in the first
     proceeding.' Rather, it is enough that a prior court 'accepted' the position now being contradicted.").
21   Accordingly, the fact that Defendants lost before the supreme court is irrelevant in light of the fact
     that the court adopted its position that the transactions were loans. Defs.' Opp. at 9:15-23.
22   Defendants' argument that they did not gain an unfair advantage in the New Hampshire litigation
     is similarly irrelevant. The argument misapplies the relevant consideration set forth by the U.S.
23   Supreme Court—the consideration is whether the party would gain an unfair advantage in *this*
     litigation, not the previous one. *New Hampshire*, 532 U.S. at 750.
24

25   [13] On July 18, 2006, Defendants filed a Notice of Recently Decided Authority, bringing two recently-
     decided California Court of Appeals judicial estoppel decisions to the Court's attention. *Jogani v.*
26   *Jogani*, 2006 WL 1882711 (Cal. App. 2006); *Gottlieb v. Kest*, 2006 WL 1881854 (Cal. App. 2006).
     Neither of these cases affect the Court's decision. The cases are unlike the facts presented here,
27   where Defendants affirmatively took positions that were accepted by prior courts. *See supra* at 6-11.

28

- 11 -

1 that the transactions at issue in this case are anything other than loans. Any

2 evidence or argument submitted to the contrary will not be considered.

3     **2.    Whether Separate Evidence Establishes Transactions Are Loans**

4     Given the Court's finding that judicial estoppel applies, it next considers

5 whether Plaintiffs have identified evidence supporting the conclusion that

6 Defendants' transactions, contrary to the label applied by Defendants, are loans.

7 California law defines a "loan of money" as a "contract by which one delivers a

8 sum of money to another, and the latter agrees to return at a future time equivalent

9 to that which he borrowed." Cal. Civ. Code § 1912. In determining whether

10 transactions are loans for purpose of usury, courts look to "whether or not the

11 bargain of the parties, assessed in light of all the circumstances and with a view to

12 substance rather than form, has as its true object the hire of money at an excessive

13 rate of interest." *Southwest Concrete Products*, 51 Cal. 3d at 705. Plaintiffs

14 identify three categories of evidence which they argue support the classification

15 of the transactions as loans: (a) the terms of the relevant contracts; (b)

16 Defendants' practices and procedures; and (c) Defendants' admissions.

17     **a.    Terms of the Relevant Contracts**

18     The "California Cash Agreement" is the document that defines the

19 standard terms and conditions of the Agreement between California restaurants

20 and Defendants. Defendants have produced five relevant versions of the

21 Agreement: September 2000, May 2001, July 2001, and September 2001

22 California Cash Agreements as well as the November 2003 California "Dining

23 Credits Agreement." Alden Decl., Exs. D-G.[14] Relying on those Agreements and

24 other evidence, Plaintiffs state that the restaurants are contractually obligated to

25 repay cash to Defendant. *See, e.g., id.*, Ex. X at 228. Plaintiffs are required to

26

27 [14] The parties have also stipulated to the authenticity of a a typed version of the Agreements as the

28 originals are written in a very small font. *See* Amended Pls.' Ex. Z ("Ex. Z").

1   allow Defendants to deduct money from their accounts until an amount equal to

2   double the cash advance is repaid, tantamount to repaying a loan. *Id*, Ex. U at

3   204-05.

4       In a true sale, "delivery of the absolute property in a thing and the receipt

5   of a price therefor consummate the transaction." *Milana v. Credit Disc. Co.*, 27

6   Cal. 2d 335, 340 (1945). In a loan, on the other hand, "the initial transaction

7   creates a debit and credit relationship which is not terminated until replacement of

8   the sum borrowed with agreed interest." *Id.* Plaintiffs identify evidence that the

9   transactions at issue here are only complete when the restaurants have repaid the

10  full amount owed, i.e., twice the amount initially advanced. Ex. Z [Sept. 2000

11  Agreement] ¶11a. Plaintiffs argue that the ongoing nature of the financial

12  relationship, the enduring contractual obligation, and the requirement that double

13  the amount of the advance be repaid are all more like a loan than like a purchase.

14  Defendants' only obligation under the contract is to advance cash. *See Wood v.*

15  *Angeles Mesa Land Co.*, 120 Cal. App. 313, 326-27 (1932).[15]

16      Plaintiffs also argue that the Agreements insulate Defendants against risk

17  of loss. Such a characteristic is more evocative of a loan where the lender does

18  not bear any risk of capital loss other than the risk associated with the borrower's

19  inability to pay. *Martin v. Ajax Const. Co.*, 124 Cal. App. 2d 425, 433 (1954).

20  Additionally, provisions allowing the "buyer" to demand that the "seller"

21  reimburse its losses are "unusual if not incongruous in an agreement providing for

22  outright sale." *West Pico Furniture Co. v. Pac. Fin. Loans*, 2 Cal. 3d 594, 604

23  (1970).

24      The contracts at issue here also contain a variety of provisions allowing

25  Defendants to "call" the loan, assuring that, at a minimum, Defendants will

26  _____

27  [15] The Court has already rejected Defendants' argument that the additional money owed was as a

28  result of marketing services performed by Defendants. Oct. 11, 2005 Order at 8:26-9:1.

- 13 -

1  receive the amount of their cash advance. Alden Decl., Ex. M at 160:19-25.

2  Because these Agreements provide for a 2:1 ratio of credits to the amount of cash

3  advanced, Defendant is guaranteed to recover at least the principal of the loan.

4  The September 2000 Agreement, Paragraph 7, allows Defendants to require

5  restaurants to immediately repay fifty percent of outstanding credits when, among

6  other things, Defendants deem themselves "insecure," the restaurant makes any

7  material modifications to its menu, prices, type of food served, theme of the

8  business, or the hours of operation. Ex. Z. Indeed, even if Plaintiffs only make a

9  few sales before Defendants "call" in fifty percent of the outstanding credits,

10  Defendants would be guaranteed a profit.[16] The Agreements' language means that

11  Defendants retain the almost unfettered right to rescind the transaction and

12  receive, at a minimum, its "purchase price."

13      Plaintiffs also note that, in addition to being able to force the payment of,

14  and thus be guaranteed of recouping, the original money advanced, the

15  Agreements give Defendants the right to accelerate the payments. While the

16  provisions contained in the various versions of the Agreements differ slightly,

17  they all allow Defendants to recoup its money. *See, e.g.,* Ex. Z [Sept. 2000

18  Agreement] ¶15; [May 2001 Agreement] ¶7(c).[17] Additionally, the plain

19  language of the Agreements establishes that invocation of these provisions does

20  not terminate the restaurant's obligations under the Agreement.[18]

21

_____

22  [16] For example, if Defendants advanced $10,000 in cash to a restaurant, Defendants would receive
   $20,000 in credits. If the restaurant repaid $6,000 of those credits via sales,$14,000 in outstanding

23  credits would remain. If Defendants invoked their rights under the Agreement, the restaurant would
   have to immediately pay in cash fifty percent of the outstanding credits, i.e., $7,000. Defendants

24  would be guaranteed to recoup the cash advanced plus a thirty percent profit of $3,000.

25
   [17] Under these provisions Defendants can be generally assured of receiving all of their money within

26  approximately one year.

27  [18] While Defendants dispute this notion, their position is belied by the Agreements' language. Indeed,

28  the plain language establishes that restaurants are under an ongoing obligation to continue repaying

### b.    Defendants' Policies and Procedures

Defendants' policies and procedures used in administering their cash advance program are similar to a traditional lender. Defendants' internal documents establish that they believe "making informed credit decisions is crucial to [their] continued success" and that they make "credit decisions at all stages of the contract process." Alden Decl., Exs. AA at 283, BB at 335. Restaurants are first required to submit a credit application similar to those used by traditional lending/leasing institutions, along with various other financial information. *Id.*, Ex. AA at 283. Defendants then conduct a comprehensive "credit check," typically requiring Dunn & Bradstreet reports, TRW reports, judgments and liens, FICO scores, etc. *Id.*, Ex. CC at 339; Dep. of Kenneth Posner at 130:21-131:6; Dep. of Stuart Chant at 103:16-22.

Additionally, Defendants typically require that restaurant owners sign a "personal guaranty" and that the restaurant execute a "security agreement" under which Defendants take a broad security interest in all of the restaurant's property. Alden Decl., Ex. N, O, AA at 287. Defendants also file "Financing Statements on all Cash Advance (RTR) Agreements" to perfect its security. *Id.*, Ex. P , AA at 288. These procedures are all in place so that if a restaurant "defaults" on its loan, Defendants have established collection procedures to collect its "debt." *Id.*, Ex. DD. The procedures include, hiring a collection attorney to bring suit, or attempting to seize and execute on Defendants' collateral. *Id.*

### c.    Defendants' "Admissions"

Last, Plaintiffs point to a number of statements made by Defendants' directors and top management establishing that the transactions are loans. Defendants' former president and CEO described the company as a "loan

_____

Defendants even after Defendants invoked any of the various provisions. Ex. Z [May 2001 Agreement] ¶15.

- 15 -

1  business." *Id.*, Ex. EE at 355, Ex. FF at 358. One of Defendants' current directors

2  inquired in 2001 about the impact of a proposed plan to stagger cash advances on

3  the "average loans size." *Id.*, Ex. GG at 360. In another document describing the

4  position of "credit analyst," Defendants' Senior Vice President Elliot Merberg,

5  Merberg sought someone who could analyze credit information to determine the

6  "risk involved in lending money to commercial customers" and "underwrite loans

7  weighing risk vs. reward." *Id.*, Ex. II at 400-01. Merberg also described cash

8  advances as "loans" in internal emails. *See, e.g., id.*, Ex. JJ at 402. Defendants'

9  General Counsel, as well as numerous present and former sales personnel and

10  managers have also described Defendants' transactions as loans. *See e.g., id.*, Ex.

11  R at 193; Decl. of Faye Fisher, ¶¶3, 12.

12  **3.    Evidence Establishes That Transactions Are Loans**

13  Whether the transactions at issue in this case constitute loans is the key

14  issue in analyzing the usury claim. It bears repeating that, in determining the true

15  nature of a transaction, courts should look to "whether or not the bargain of the

16  parties, assessed in light of all the circumstances and with a view to substance

17  rather than form, has as its true object the hire of money at an excessive rate of

18  interest." *Southwest Concrete Products*, 51 Cal. 3d at 705 (1990). In light of the

19  evidence and the Court's finding that judicial estoppel applies, the Court

20  finds that, notwithstanding Defendants' labels to the contrary, these transactions

21  constitute loans.

22  **B.    Whether the Transactions Charged a Usurious Rate of Interest**

23  The second element of a usury claim asks whether the interest to be paid

24  exceeds the constitutional maximum. *Ghirado*, 8 Cal. 4th at 798. There is no

25  dispute that the California Constitution establishes that interest rates in excess of

26  ten percent are usurious. Cal. Const., Art. XV, § 1 part 2. Plaintiffs rely on the

27  terms of Defendants' agreements, Defendants' admissions, and other statistical

28

- 16 -

1    evidence to establish that a usurious rate of interest was charged via these

2    transactions.

3    **1.    Terms of the Agreements**

4        The terms of the Agreements allow Defendants to force repayment in such

5    a time as to call for usurious interest. As noted above, the Agreements contain

6    various provisions allowing Defendants to "call" fifty percent of the outstanding

7    credits. Pursuant to the Agreements, Defendants may invoke such a provision if,

8    among other things, the restaurants do not hit a monthly benchmark of sales

9    representing ten percent of the amount originally advanced or if Defendants

10   "deem" themselves financially insecure. Depending on when Defendants invoke

11   such a provision, the interest effectively being charged is dramatically

12   increased.[19] Accordingly, the agreement may call for usurious interest despite its

13   lack of an explicit fixed time for payment. *Calimpco, Inc. v. Warden*, 100 Cal.

14   App. 2d 429, 450 (1950)(overruled on other grounds)("where

15   the excessive interest is caused by a contingency under the lender's control, or not

16   under the borrower's control, the transaction is usurious.").

17       The Agreements afford Defendants the right to ensure that they receive a

18   return in excess of the constitutional limit. Plaintiffs provide evidence that, in the

19   typical case, with repayment of twice the amount advanced in approximately one

20   year, restaurants are paying an annual interest rate of 419%. Decl. of Bruce Ross

21   ¶4, Ex. A. Defendants counter that no usurious interest can be established because

22   the Agreements do not call for any interest at all. However, the point of looking

23   behind the Agreements is to ensure parties do not attempt to evade the usury law.

24   _____

25   [19] For example, if the Defendants made a cash advance of $10,000, thus "purchasing" $20,000 of
     dining credits, the "interest rate" would depend on how quickly a restaurant repaid the $20,000 in

26   credits. If a restaurant repaid the $20,000 in six months, either as a result of booming business or
     because Defendants repeatedly invoked various provisions, the restaurant would have effectively

27   paid a much higher interest rate for the use of the $10,000 than a restaurant that repaid the credits
     over a period of twelve months, or 2 years.

28

1  Accordingly, the lack of the work "interest rate" or payment schedule, does not,

2  by itself, defeat the finding of usurious interest. *See, e.g., Calimpco, Inc.*

3       Defendants also argue that there is no typical period of repayment and that

4  the Agreements themselves contain no limit on when restaurants must repay the

5  credits. However, the fact that some, or even many restaurants may not repay the

6  loans within a certain period of time does not mean that there is no typical or

7  average length of repayment. Additionally, Defendants' position that the

8  Agreements contain no limit on repayment time flies in the face of provisions

9  allowing Defendants to call outstanding credits if restaurants do not sell meals

10  monthly equal to ten percent of the original amount of the cash advance.

11  Provisions such as those create a de facto outer limit on repayment.

12      **2.**    **Defendants' Admissions**

13       Plaintiffs identify evidence which they argue establishes that Defendants

14  expect repayment in such a short time that it would necessarily create an illegal

15  interest rate. In the Form 10-Ks filed with the SEC in 2001-2004, Defendants

16  stated that they expected repayment of the amount owed in a period of six to

17  twelve months. Alden Decl., Exs. U at 204-05, V at 212, W at 225, X at 229.

18  Other documents, such as Defendants' "Restaurant Policy" and a booklet entitled

19  "Managing Your Business/Paperwork," state that Defendants' cash advance

20  policy was to advance no more money than could be collected in four to eight

21  months. *Id.*, Exs. CC at 337, AA at 319, 327.

22       Additionally, Defendants' former executives provided testimony that they

23  expected a short period of repayment. Former senior account executives and the

24  former chief financial officer testified that the expectation was that restaurants

25  would repay the amount owed between six months to two years. Dep. of

26  Geraldine Smith at 74:24-25; Posner Dep. at 36:18-37:2. Smith also testified that

27  Defendants used sophisticated computer software to determine beforehand how

28

1  long it would take for a restaurant to repay the loan. Smith Dep. at 135:5-8.

2  Plaintiffs provide evidence that, even taking the facts most beneficial to

3  Defendants, i.e., a hypothetical repayment of 24 months and a loan ratio of 1.375

4  to 1 (where the restaurants owe $1.37 for each $1 advanced by Defendants, the

5  lowest ratio used by Defendants), Defendants would still receive an interest rate

6  of 38 percent per annum. Ross Decl. ¶6, Ex. C.

7      **3.    Statistical Evidence**

8          Data provided by Defendants further establishes the actual interest rates

9  paid by various class members are all in excess of the constitutional maximum.

10  Plaintiffs provide evidence that every class member who borrowed from

11  Defendants, and repaid both principal and interest, incurred an annual interest rate

12  in excess of the constitutional maximum. Ross Decl. ¶7. Plaintiffs identify

13  evidence that some restaurants paid interest rates far in excess of what California

14  law allows, and that the average interest rate paid by class members throughout

15  the class period was 177 percent. *Id.* ¶9, Exs. D, E.

16          Defendants describe Plaintiffs' expert's methodology as "flawed," alleging

17  that he made numerous mathematical and other errors, including using the wrong

18  formula to compute the annual interest rate, incorrectly understating the amount

19  of principal.[20] Adler Decl. ¶11. However, given the Court's findings, the analysis

20  conducted by Defendants' expert nonetheless constitutes usurious interest.

21  Defendants' expert calculated the annual interest rate that would arise when a

22  restaurant paid the full amount owed (e.g., $10,000 advanced, plus the additional

23  $10,000 in interest) over the course of a year, concluding that the annual yield

24  would be 152.34%. *Id.* Plaintiffs' expert recalculated the annual interest for all

25  _____

26  [20] One of the additional flaws identified by Defendant is that Ross, Plaintiffs' expert, failed to take
    into account the value of marketing services. As has been previously noted, this Court has already
27  ruled that marketing is not to be calculated as part of the value of the Agreements as the contracts
    do not mention any such marketing and the Agreements contain an integration clause.

28

- 19 -

1    class members using the formula suggested by Defendants' expert. Reply Decl. of

2    Bruce Ross, Ex. B. Using Defendants' expert formula, 98.3% of the class

3    members paid interest above the constitutional maximum. *Id.*

4        The Court finds there is no evidence creating a factual dispute regarding

5    whether usurious interest was charged under the Agreements. Initially, whatever

6    the interest actually paid by restaurants, there is no genuine issue that Defendants

7    had the sole power to force repayment at such a rate as to constitute usury. *See,*

8    *e.g., Anderson*, 477 U.S. at 252. Additionally, there is undisputed evidence that

9    Defendants expected repayment in such a short time that, even using Defendants'

10   expert's formula, usurious interest would have been paid. Finally, using the actual

11   data of the repayment by restaurants, whether the Court were to consider the

12   calculation of interest using the formula advocated by either expert, usurious

13   interest would nonetheless result.

14   **C.    Whether the Transactions Are Absolutely Repayable**

15       The third element of usury is that "the loan and interest must be absolutely

16   repayable by the borrower." *Ghirardo*, 8 Cal. 4th at 798. Where the agreement

17   does not require the repayment of the money originally provided, courts have

18   found that usury does not exist. *DeGuere*, 56 Cal. App. 4th at 509. Here, the

19   various versions of the Agreements establish that participating restaurants are

20   under an absolute obligation to repay the full amount of the outstanding credits,

21   i.e., both the amount of the original advance as well as the premium. Plaintiffs

22   have identified evidence that the Agreements contained provisions assuring

23   Defendants of being repaid the "principal," while obliging the restaurants to

24   continue paying Defendants until all of the outstanding debt had been paid. *See,*

25   *e.g.,* Alden Decl., Ex. M at 160:19-25; Ex. Z [Sept. 2000 Agreement] ¶15, Z [May

26   2001 Agreement] ¶7(c).

27   ///

28

1    Defendants focus on the amount owed, arguing that, in the event of the

2    termination of the agreement, Plaintiffs are only required to repay an amount

3    equal to fifty percent of the outstanding credits, and that Defendants would not

4    receive interest. Defendants rely on the Agreements which they have provided for

5    the Court to review. The plain language of the Agreements make clear that the

6    restaurants may not terminate their repayment obligations until the amount of

7    outstanding credits is $0.

8        Defendants also argue that they only recover interest if their members

9    patronize the restaurants. In the event that members do not eat at the restaurants,

10   Defendants contend they would experience losses. However, various Agreement

11   provisions allow Defendants to force repayment even if no one dines at the

12   restaurant. Ex. Z [May 2001 Agreement] ¶7(c), ¶7(g). Additionally, even if

13   Defendants were correct that repayment was contingent on its members dining at

14   the restaurants, when contingencies are only remotely likely transactions are

15   "presumably usurious." Restatement (First) of Contracts § 527 cmt. a (1937); *see*

16   *also Teichner v. Klassman*, 240 Cal. App. 2d 514, 522-23 (1966).

17       It is undisputed that Defendants conduct a thorough credit analysis of each

18   restaurant before deciding whether to do a cash advance, including using

19   sophisticated computer software to predict when the outstanding credits will be

20   repaid. Posner Dep. at 33:21-36:9, 130:21-131:6; Smith Dep. 135:5-8.

21   Defendants' senior executives testified that they have never heard of members

22   failing to dine at participating restaurants. Posner Dep. at 67:13-14; Merberg Dep.

23   at 54:8. Plaintiffs provide evidence that, using data produced by Defendants, the

24   average repayment time of the 488 restaurants who took out a single loan was

25   twelve months and every single restaurant in the group repaid within a time

26   period generating an interest in excess of ten percent. Ross Decl. ¶7, Ex. D.

27   ///

28

- 21 -

1   In light of the unambiguous language of the Agreements' provisions and

2   the other evidence identified, the Court finds that the transactions at issue here

3   were absolutely repayable. Defendants have identified no material dispute that

4   would prevent such a finding. *See, e.g., Anderson*, 477 U.S. at 252 ("[T]here must

5   be evidence on which a jury could reasonably find for the opposing party.").

6   **D.    Whether Defendant Had a Usurious Intent**

7   The final element of a usury claim under California law is that "the lender

8   must have a willful intent to enter into a usurious transaction." *Ghirardo*, 8 Cal.

9   4th at 798. In usury cases, the inquiry is not an exacting one. "[T]he intent

10   sufficient to support the judgment does not require a conscious attempt, with

11   knowledge of the law, to evade it. The conscious and voluntary taking of more

12   than the legal rate of interest constitutes usury." *Id.* at 799. Some California

13   courts have abandoned the intent element altogether where a transaction is

14   usurious on its face. *See, e.g., Williams v. Reed*, 48 Cal. 2d 57, 68 (1957)("When

15   the transaction violates the usury law the intent of neither of the parties is

16   material"); *In re: Dominguez*, 995 F.2d 883, 886 (9th Cir. 1993)("California's

17   usury law imposes virtually strict liability on lenders").

18   Plaintiffs argue that Defendants' intent to obtain a usurious amount of

19   interest can be inferred from the Agreements themselves. *Martin*, 124 Cal. App.

20   2d at 432 (intent "is conclusively presumed from an instrument which clearly

21   shows the character of the agreement"). Plaintiffs identify the following evidence

22   supporting the requisite intent: (1) Defendants' only obligation under the

23   Agreements is to advance cash; (2) Defendants are later repaid in cash; (3) the

24   relationship does not terminate after the purported "sale," but only after the

25   restaurant repays the credits; (4) Defendants are guaranteed to recoup the amount

26   of the advance and the Agreements provide multiple ways in which Defendants

27   can accelerate repayment; and (5) the Agreements specify the repayment terms,

28

- 22 -

1   interest, and repayment period, albeit using disguised terminology. Alden Decl.,

2   Exs. D-G.

3        Plaintiffs also argue Defendents' admissions evince the necessary intent.

4   Defendants do not identify a genuine issue of material dispute that would prevent

5   the Court from finding the requisite intent. Given the Court's finding that the

6   transactions constituted loans, the Agreements establish the requisite intent in

7   light of the guarantee that Defendants will recoup, at a minimum their initial cash

8   advance, and additional amounts as well. Additionally, the internal documents

9   and Defendants' repeated characterization of the transactions as loans establish

10  the usurious intent.

11       Accordingly, having established all four elements of usury, the Court

12  GRANTS Plaintiffs' motion for summary judgment and DENIES Defendants'

13  motion as to Plaintiffs' usury claim.

14  **II.    Plaintiffs' Unfair Competition Claim**

15       Defendants move for summary judgment as to Plaintiffs' unfair

16  competition claim, arguing that it merely repackages Plaintiffs' usury claim. The

17  California Unfair Competition Law forbids unfair business practices and

18  deceptive advertising. Any violation of California law in furtherance of business

19  activity constitutes the necessary predicate for a violation of §17200. *See People

20  v. Cole*, 113 Cal. App. 4th 955, 979 (2003). Defendants argue that Plaintiffs' UCL

21  claim depends on Plaintiffs' proving a violation of the state usury law. However,

22  in light of the Court's findings regarding Plaintiffs' usury claim, reliance on

23  California's usury law supports Plaintiffs' unfair competition claim.

24       Plaintiffs' complaint also alleges that various provisions of the Agreements

25  constitute unfair business practices. Defendants argue that the identified

26  Agreement provisions are neither procedurally nor substantively unconscionable.

27  However, Defendants' arguments do not address the allegations contained in

28

1   Plaintiffs' complaint and fail as a matter of law. Plaintiffs' position is that the

2   provisions of the agreement, taken together, are "unfair." *See, e.g.,* Alden Decl.,

3   Exs. D-G ¶10, ¶5(e), ¶11(a), ¶15. Plaintiffs provide evidence that the provisions

4   are set forth in extremely small font without differentiation between the various

5   penalty provisions contained in the agreement.

6       Additionally, Plaintiffs allege that any advertising that is unfair, deceptive,

7   misleading, or untrue constitutes unfair competition within the meaning of

8   Section 17200. Defendants misinterpret Plaintiffs' allegation to mean that

9   Defendants have engaged in deceptive advertising based on Defendants'

10  description of its marketing programs.[21] Plaintiffs actually allege that Defendants

11  deceptively advertised the program as a pay-for-performance arrangement,

12  whereby a repayment obligation would only be triggered by *new* customers

13  dining at the restaurant. Plaintiffs also allege that Defendants falsely represented

14  that each qualifying purchase by one of Defendants' members would be profitable

15  for the restaurants which Plaintiffs allege is untrue.

16      Defendants also argue that Plaintiffs cannot prove an injury in fact as

17  required under the UCL. Plaintiffs must prove a causal link between the alleged

18  injury and Defendants' business practices. *In re: Firearm Cases*, 126 Cal. App.

19  4th 959, 978-79 (2005). Defendants argue that no causal link has been proven

20  between Defendants' allegedly unconscionable contract terms or advertising on

21  the one hand, and any alleged harm on the other. Plaintiffs present evidence

22  suggesting that, but for the deceptive advertising, the restaurants would not have

23  entered into the agreements and subjected themselves to the large debts as a result

24  ///

25

26

27  [21] Defendants' Motion with respect to the "advertising" basis of Plaintiffs' UCL claim is moot with
    respect to unnamed class members as Plaintiffs did not ask the Court to certify the class on that basis.
28  *See* Pls.' Opp. at 24 n.12

1  of the obligations they incurred. Accordingly, the Court DENIES Defendants'

2  motion for summary judgment as to Plaintiffs' unfair competition cause of action.

3  **III.    Plaintiffs' Declaratory Relief Cause of Action**

4        Defendants move for summary judgment as to Plaintiffs' declaratory relief

5  cause of action, arguing that it is unnecessary and is duplicative of the other

6  causes of action. Accordingly, Defendant argues the third cause of action should

7  be dismissed. *California Ins. Guarantee Ass'n v. Superior Court*, 231 Cal. App.

8  3d 1617, 1624 (1991). Defendants' arguments fail both because this Court has the

9  authority to issue declaratory relief, pursuant to 28 U.S.C. § 2201(a), in a case of

10  actual controversy within its jurisdiction, and because the requests for relief are

11  not entirely duplicative.

12        To the extent that there are class members who are determined to have paid

13  no interest on their usurious loans the class members may not be entitled to

14  recovery of usurious interest. However, the restaurants would have a claim for a

15  declaratory judgment canceling any outstanding interest obligations. Indeed, it is

16  established law that a borrower who takes a usurious loan is provided several

17  possible remedies that are cumulative and may be combined in an action for

18  declaratory relief. *Glaire v. La Lanne-Paris Health Spa, Inc.*, 12 Cal. 3d 915, 918

19  (1974). Accordingly, the Court DENIES Defendants' motion for summary

20  judgment as to Plaintiffs' declaratory judgment cause of action.

21  **IV.    Dismissal of Class Members Who Did Not Pay "Interest"**

22        Defendants move for summary judgment as to those class members who

23  did not pay any interest, that is, money in excess of the amount initially advanced.

24  Defendants note that "it is only when there has been an actual payment of

25  usurious interest that the one receiving such interest is held to have violated the

26  terms of the Usury Law and accordingly held liable for the penalties thereby

27  imposed." *Penziner v. West Am. Fin. Co.*, 10 Cal. 2d 160, 179 (1937). Defendants

28

- 25 -

1  argue that at least 560 members of the class never paid "usurious interest" even

2  under Plaintiffs' theory of the case. Pointing to the testimony of Plaintiffs' expert,

3  Defendants argue that 36 class members never made any payments to Defendants,

4  477 made no "interest" payments, and 47 class members paid "interest" of 10% or

5  less. Ross Dep. at 123:21-124:23, Ex. 29.

6      While Plaintiffs apparently concede that members who did not pay

7  usurious interest are not entitled to monetary damages,[22] Plaintiffs argue that they

8  may still be entitled to declaratory and injunctive relief. Plaintiffs also argue that

9  any class member who paid even a dollar of interest can sue to recover the

10  interest paid, even if the rate incurred is not yet usurious. Indeed, California

11  courts have held that transactions can be usurious on execution. *Penziner*, 133

12  Cal. App. at 590. Accordingly, the Court DENIES Defendants' motion for

13  summary judgment to dismiss any class members that did not pay interest.

14  **V.    Evidentiary Objections**

15          **A.    Defendants' Objections**

16              **1.    Objections to Exhibits Attached to Alden Declaration**

17                  **a.    Objections to Exhibits N, O, and P**

18      Defendants object to Exhibits N, O, and P on the grounds that the exhibits

19  have not been properly authenticated by the declarant. The exhibits purport to be

20  copies of the standard personal guaranty agreement, security agreement, and

21  UCC-1 financing statement used by Defendants in their transactions. Plaintiffs

22  argue the exhibits are identical to those produced by Defendants in discovery.

23  Plaintiffs have satisfied Fed. R. Evid. 901, producing evidence sufficient to

24  ///

25

---

26  [22] Plaintiffs do, however, contest the number of members that Defendant contends paid no interest.
    Rather than the 477 members paying no interest, Plaintiffs contend that they simply did not have a
27  meaningful yield. Ross nonetheless calculated that the 477 members have damages totaling
    $233,000.
28

1    support a finding that the documents are what the proponent claims. Accordingly,

2    the Court OVERRULES the objections.

3             **b.       Objections to Exhibits Q, S, T, and KK**

4             Defendants object to Exhibits Q, S, T, and KK on the grounds that they

5    constitute inadmissible hearsay. The exhibits are news articles about Defendants'

6    cash advance policy. Exhibits Q and S contain quotations made by the former

7    executives of Defendant companies which constitute statements by a party-

8    opponent. Fed. R. Evid. 801(d)(2). However, the three exhibits nonetheless

9    constitute inadmissible hearsay because the transcription of the quotations by

10   reporters are out-of-court statements and do not fall within the catchall exception

11   contained in Fed. R. Evid. 803(24). *See Larez v. Los Angeles*, 946 F.2d 630, 642-

12   44 (9th Cir. 1991). Accordingly, the Court SUSTAINS the objections.

13            **c.       Objection to Exhibit Z**

14            Defendants objected to Exhibit Z on the grounds that the declarant lacks

15   personal knowledge regarding the creation of the exhibit. However, pursuant to a

16   stipulation, Exhibit Z has been withdrawn and replaced with Amended Exhibit Z.

17   Accordingly, the Court OVERRULES the objection as MOOT.

18            **d.       Objections to Exhibits EE, FF, GG, II, and JJ**

19            Defendants object to Exhibits EE, FF, GG, II, and JJ on the grounds that

20   the exhibits are not relevant, constitute inadmissible lay witness opinion, and on

21   the basis that the declarant lacks personal knowledge. The exhibits consist of

22   internal documents in which Defendants' board members and executives describe

23   Defendants' transactions as "loans." While the label Defendants use in describing

24   the transactions is not dispositive, statements of Defendants' CEO and executives

25   is relevant regarding how Defendants internally characterized the transactions.

26   Additionally, the statements contained in the documents are not inadmissible lay

27   witness opinions as they are rationally based on the declarants' perception and is

28

1    helpful to the clear understanding of the central fact in dispute. Accordingly, the

2    Court OVERRULES the objections.

3            e.      **Objections to Exhibit LL and MM**

4            Defendants object to Exhibits LL and MM on the grounds that they are not

5    relevant. Exhibit LL is an internal email exchange discussing a product offered by

6    another company. Defendants' discussion of a lending program offered by

7    another company does not make it more or less likely that Defendants were

8    engaged in a lending program. Fed. R. Evid. 401. Exhibit MM is an internal

9    memo discussing a court decision in which Defendants' transactions with

10   restaurants were determined not to be usurious loans. The discussion of the case

11   does not make it more or less likely that Defendants were engaged in usury. *Id.*

12   Accordingly, the Court SUSTAINS the objections.

13           e.      **Objections to Exhibits OO and PP**

14           Defendants object to Exhibits OO and PP on the grounds that they are not

15   relevant. The exhibits are internal documents in which Defendants discuss their

16   product and concerns regarding the risk of running afoul of usury laws.

17   Defendants' discussion of the parameters of their cash advance program and the

18   impact of usury laws on their product is relevant as it tends to make a number of

19   usury elements more probable than they would be without the evidence, such as

20   the element of usurious intent as well as whether the transactions constituted

21   loans. Accordingly, the Court OVERRULES the objections.

22           f.      **Objection to Exhibit QQ**

23           Defendants object to Exhibit QQ on the basis of relevance. The exhibit is

24   the email sent by an employee who was resigning; the email contained a

25   conclusory statement that Defendants' transactions were usurious. The statement,

26   by a low-level employee, in a angry email, does not make it more likely that

27   ///

28

1   Defendants were engaged in usury. Fed. R. Evid. 401. Accordingly, the Court

2   SUSTAINS the objection.

3        **2.    Objections to the Declaration of Faye Fisher**

4        Defendants object to pg. 2:16 on the grounds that it is inadmissible lay

5   witness opinion. Fisher declares that Defendants' product works much like a

6   traditional loan. Fisher worked for Defendants for approximately twenty years,

7   the last ten of which she was vice president of sales. The statement is rationally

8   based on her perception and is helpful to the clear understanding of the central

9   fact in dispute. Defendants object to pg. 2:18-19 on the basis that Fisher lacks

10  personal knowledge. Fisher declares restaurants typically pledge to repay

11  Defendants twice the amount of the cash advance. As former vice president of

12  sales, Fisher oversaw the sales of Defendants' products to restaurants. She has the

13  requisite knowledge to so testify. Additionally, Defendants object on the basis of

14  the best evidence rule, however Fisher is not testifying about a particular

15  document but rather the general terms and characteristics of Defendants' financial

16  program.

17       Defendants object to pgs. 2:23-24, 3:1-2, 3:6-7 on the basis that it

18  constitutes impermissible lay witness opinion testimony and that Fisher lacks

19  personal knowledge. Fisher declares that Defendants only lends money to

20  selected restaurants, that consumer's payments are used to pay down the balance

21  of the restaurant's loan, and that Defendants withdraw money from the

22  restaurant's account until twice the amount of the cash advance is repaid. Fisher

23  had knowledge of Defendants' business practices and of the general process by

24  which transaction occurs, such as the use of computer software to evaluate

25  restaurants. Defendants also object to ¶¶8-9 and pg. 4:22-23, on the grounds that

26  they violate the best evidence rule and that Fisher lacks personal knowledge.

27  Fisher has demonstrated her personal knowledge about Defendants' program in

28

general and her testimony is not offered to prove the contents of a particular

document.

Defendants object to ¶¶13-14 on the grounds that ¶13 constitutes

impermissible lay witness opinion testimony and that Fisher lacks personal

knowledge, and that ¶14 is irrelevant. With regard to ¶13, Fisher merely discusses

the process used when restaurants default or breach their agreements. As former

vice president of sales, Fisher has established her personal knowledge and the

basis for her opinion. However, with regard to ¶14, Fisher's discussion of the

circumstances under which she left the company are irrelevant to this case.

Accordingly, the Court OVERRULES Defendants' objections with the

exception of Defendants' objection to ¶14 which the Court SUSTAINS.

**3.    Objections to the Declaration of Vicki Rothman**

Defendants object to pgs. 2:12, 25-26, 3:8, 26-28, 4:3-4, 15-16, 22-23 and

¶¶5 and 9  on the grounds that it is inadmissible lay witness opinion testimony

and lacks personal knowledge. Rothman worked as a sales representative. The

various statements opine that Defendants are in the business of loaning money

and purport to describe the transaction process and content of the agreements.

Given that Rothman's only experience was in selling the product in one region,

no basis has been established for her opinion as to Defendants' business overall.

Defendants also object to ¶¶12 and 14 on the basis that they constitute

inadmissible lay witness opinion testimony. Rothman describes the sales pitch

used and the use of computer software by salespersons. Given her experience as a

sales representative, Rothman's opinion is rationally based on her perception.

Defendants object to ¶¶13, 15, and 17 as well as pg. 5:25-27 and 6:2-8 on the

basis that it constitutes inadmissible lay witness opinion testimony and Rothman

lacks personal knowledge. In light of her experience as a sales representative, no

basis has been established allowing her to so testify. Accordingly, the Court

1  SUSTAINS Defendants' objections with the exception of the objections to ¶¶12

2  and 14, which the Court OVERRULES.

3       **4.    Objection to the Declaration of Bruce Ross**

4       Defendants object to the declaration of Plaintiffs' expert, Bruce Ross.

5  Defendants argue that Ross' mathematical calculations are incorrect and that his

6  calculations are incomplete because they did not include the value of marketing.

7  With regard to Ross' calculations, his declaration is being offered not for his

8  damage calculations, but rather to support that the interest being charged

9  exceeding the constitutional maximum. Additionally, a difference of opinion

10  between experts regarding which formula to use to calculate interest is not a basis

11  for the exclusion of an expert's opinion. *See, e.g., Westbrook v. Fairchild*, 7 Cal.

12  App. 4th 889, 893 n.4 (1992). With regard to the inclusion of the value of

13  marketing, the Court has already held that marketing was not a part of the

14  Agreements. *See* Oct. 11, 2005 Order at 8:26-9:1. Accordingly, the Court

15  OVERRULES Defendants' objection.

16       **B.    Plaintiffs' Objections to the Declaration of James Adler**

17       Plaintiffs object to the declaration of Defendants' expert, James Adler.

18  Plaintiffs argue that Adler's opinions regarding the parties' rights and obligations

19  under the Agreements have no basis given his deposition testimony that he had

20  not read the agreements. However, Adler's declaration makes clear that he has

21  reviewed the relevant documents and that his opinions are based on sufficient

22  facts and data. Accordingly, the Court OVERRULES Plaintiffs' objections.

23                              **CONCLUSION**

24       Based on the foregoing, the Court finds that Plaintiffs have established the

25  requisite four elements of a usury claim. Accordingly, the Court GRANTS

26  Plaintiffs' motion for summary judgment and DENIES Defendants' motion as to

27  ///

28

1  Plaintiffs' usury claim. The Court DENIES Defendants' motion for summary

2  judgment as to Plaintiffs' claim for unfair competition and declaratory relief. *See*

3  *supra* at 23-25. The Court also DENIES Defendants' motion to dismiss those

4  class members who allegedly did not pay interest.

5

6  IT IS SO ORDERED.

7

8  DATED: July 18, 2006

9                                          CONSUELO B. MARSHALL
10                                         United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28